UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10346-GAO

ERIC W. SCHELL,
Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,
Defendant.

OPINION AND ORDER
March 7, 2012

O'TOOLE, D.J.

## I. Introduction

The plaintiff, Eric Schell, appeals the denial of his application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits by the Commissioner of the Social Security Administration ("Commissioner"). Schell applied for SSDI and SSI benefits on May 14, 2007, claiming he became disabled as of June 16, 2006. (Administrative Tr. at 161, 166 [hereinafter R.].) Upon having his disability claims denied at the initial level of review (id. at 66), and again upon reconsideration (id. at 61), Schell timely filed a written request for a hearing before an Administrative Law Judge ("ALJ"). (Id. at 79.) The hearing was held on August 14, 2009 before ALJ J. Alan Mackay. (Id. at 29-56.) On September 23, 2009, the ALJ issued a written decision denying Schell SSDI and SSI benefits. (Id. at 4-20.) Despite a finding that Schell did have certain severe impairments, the ALJ concluded that if Schell stopped his substance abuse, there would be a significant number of jobs in the national

economy that Schell could perform. (Id. at 18.) Thus, the ALJ found that Schell was not disabled at any time from the alleged onset date through the date of his decision. (Id. at 19.)

Before the Court is Schell's motion for summary judgment or, in the alternative, for remand and the defendant's motion to affirm the decision of the Commissioner.

## II.     Factual Background

Schell was forty-three years old at the time he applied for SSI and SSDI benefits. A high-school graduate with one year of college (id. at 184), Schell worked cashier jobs at CVS and Stop & Shop, and at other times was a hairdresser at several different salons. (Id. at 40.) Schell testified that he last worked at a CVS in the Longwood Medical area but quit this job because he could not handle the stress of being in constant contact with the general public. (Id. at 41.) Since his alleged onset date, Schell has not engaged in substantial gainful employment. (Id. at 10.) Schell claims disability due to increasingly serious depression and bipolar disorder, which he alleges have left him unable to work since the alleged June 2006 onset date. (Id. at 179.)

### A.     Medical History

During the relevant period, Dr. Federico Erebia of Fenway Community Health ("FCH") was Schell's primary care physician. (Id. at 239.) While Dr. Erebia mainly treated Schell for physical ailments, on several occasions Dr. Erebia noted that Schell suffered from alcoholism. (Id. at 282, 285, 290, 296.) Approximately one month before his alleged onset date, Schell called FCH and stated that he was depressed and bipolar. (Id. at 237.) According to notes taken by mental health counselor Emily Frank, Schell requested mental health services. (Id.) However, when asked about his request to be seen by a mental health counselor, Schell stated that he did not remember doing so and must have been drunk at the time. (Id.)

On March 26, 2007, Schell visited with Dr. Erebia. (Id. at 291.) Among other things, Schell reported that he was no longer working due to his condition. (Id.) Schell further reported to Dr. Erebia that he was ordered by a judge to seek counseling due to legal trouble that had arisen when, in an intoxicated state in January, 2007, he set off a fire alarm and sprinkler system. (Id.) Dr. Erebia noted that Schell has a "strong history of alcoholism" and can be "difficult to deal with when intoxicated." (Id.) Further, due to his strong potential for alcoholism and his uncertain mental health status, Dr. Erebia declined Schell's wish to be prescribed psychotropic medication. (Id.)

FCH's records indicate that Schell had crisis contact with FCH on June 12, 2007, due to suicidal ideation and intoxication. (Id. at 328.) During that crisis contact, Schell was observed to be intoxicated by licensed social worker Christel Charlesworth. (Id.) Ms. Charlesworth noted that Schell was "very stressed" about the possibility of being evicted from his apartment. (Id.) During the period in which Ms. Charlesworth observed Schell, she noted that he was very "tangential," going from tearful to having "bright affect and laughing." (Id.) The next day, on June 13, 2007, Patrice Berman at FCH received a call from an individual who was concerned that Schell might try to commit suicide. (Id. at 327.) Berman advised the individual who made the call to call 911 if he was "that worried about [Schell]." (Id. at 327.)

On June 20, 2007, Schell visited FCH to meet with Dr. Erebia. (Id. at 276.) The purpose of the meeting was to discuss Schell's alcoholism. (Id.) However, Schell arrived to the clinic drunk and was unable to clearly express his thoughts. (Id.) The prior week, Schell had visited the clinic in an intoxicated state and been verbally abusive to staff members, although he claims to not remember these incidents. (Id.) Schell informed Dr. Erebia that he attended two detoxification facilities recently, leaving the first after only a one-day stay and having been

discharged from the second after three days. (Id.) Further, Schell reported that his alcoholism had landed him on probation due to his constant acting out while intoxicated. (Id.)

Later that summer, on July 25, 2007, Schell visited FCH and met with counselor Liana Buccieri. (Id. at 316.) Schell told Ms. Buccieri that he was recently in a detoxification program at Beth Israel but that this was not successful and that he had recently gotten into trouble at his apartment for drinking. (Id.) Schell reported to Ms. Buccieri that he had been sober since July 20, 2007, but that prior to that point he had been drinking approximately one pint of vodka ten days out of the month. (Id.) During this visit with Ms. Buccieri, a sober Schell was alert, engaged, pleasant and grossly intact. (Id.) Schell told Ms. Buccieri that he did not like in-patient detoxification centers but that his main motivation to stop drinking was to keep his housing situation stable. (Id.) He told Ms. Buccieri that the housing authority required him to be in 30 days of substance abuse treatment in order to stay in public housing. (Id.)

Additionally, throughout the summer of 2007, Schell was meeting with licensed social worker Margaret Dolan at the Boston Medical Center on a monthly basis. (Id. at 411, 406, 404-05, 401.) During this time period, Schell's diagnoses were always listed as alcohol dependence and bipolar disorder. (Id. at 409, 407, 404, 401.) Further, during the relevant time period, Ms. Dolan consistently assessed Schell's Global Assessment of Function ("GAF") score as 55-60.[1] (Id. at 409, 407, 405, 401.) During one session, Ms. Dolan noted that it was difficult to know what Schell's diagnoses were because of all the alcohol he consumed. (Id. at 407.)

---

[1] A GAF of 51-60 indicates moderate symptoms, such as flat affect or occasional panic attacks or moderate difficulty in social, occupational, or school functioning, such as having few friends or conflicts with peers or coworkers. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 4th Ed. 34 (4th Ed. 2000) (DSM-IV). The ALJ's finding that Schell would have moderate social functioning limitations absent alcohol abuse is consistent with Dr. Johnson's March 29, 2009 assessment.

On August 8, 2007, Schell met with Steven Broder, Ph.D., for a consultative psychodiagnostic examination. (Id. at 330.) Dr. Broder inquired as to what the basis for Schell's disability was, to which Schell responded: "I'm assuming that it's mental health." (Id.) Dr. Broder noted that Schell had difficulty stating what exactly his psychological problems were. (Id.) Schell told Dr. Broder that he was not taking any psychiatric medications and that he had not been previously hospitalized or treated for psychiatric issues. (Id. at 331.) Schell informed Dr. Broder that his daily routine consisted of making coffee, going to appointments, cooking two meals, and occasionally traveling to the library. (Id. at 333.) Schell further informed Dr. Broder that he was recently released from a detoxification program and that prior to his release he had been drinking "two to three forty-ounce bottles of beer in the evening." (Id. at 331.)

During the consultative examination with Dr. Broder, Schell made eye contact and was talkative and expressive. (Id. at 334.) Schell informed Dr. Broder that he has mood swings and that when home watching TV, he will suddenly "start balling for no reason." (Id.) In his report, Dr. Broder stated that Schell "presented as an impulsive and expressive to histrionic individual, who would likely have difficulty with emotional self-regulation." (Id. at 336.) However, Dr. Broder did not think that Schell presented with sufficient symptoms to warrant a diagnosis of bipolar affective disorder. (Id.)

On behalf of the Social Security Agency, Michael Abruzzese, Ph.D., completed a Psychiatric Review Technique Form on August 23, 2007. (Id. at 347.) Upon a review of Schell's FCH records, Dr. Broder's consultative examination report, along with other evidence in the record, Dr. Abruzzese concluded that Schell did not have a severe mental impairment. (Id. at 347, 359.) Dr. Abruzzese found that while there were some secondary psychiatric problems, Schell's "predominant issues" were alcohol abuse and poor self control. (Id.) Dr. Abruzzese

concluded that no medical evidence in the record indicated any severe psychiatric impairment. (Id.)

Schell met with Dr. Peggy Johnson, M.D., at Boston Medical Center on October 10, 2007, and told her that he was "not doing okay." (Id. at 393.) Dr. Johnson noted that Schell "continued to present with Cluster B character traits" and diagnosed him with alcohol dependence and bipolar disorder. (Id. at 395.) Dr. Johnson's notes indicate that Schell was not a serious risk to harm himself but that he did pose some risk when he was under the influence of alcohol. (Id.) Like Ms. Dolan previously, Dr. Johnson assigned Schell a GAF score of 55-60. (Id. at 396.) Schell was taking Celexa for his depression at this time. (Id.)

On October 25, 2007, Schell met with Liana Buccieri at FCH to discuss a treatment plan for his substance abuse problem. (Id. at 313.) Ms. Buccieri and Schell discussed acupuncture treatments, group and individual counseling sessions, and attendance at Alcoholics Anonymous meetings. (Id.) On November 7, 2007, Schell called FCH and informed them that he had decided he wanted to begin inpatient detox. (Id. at 312.) Schell told FCH that he needed to be by himself for a few days so he could "get sober and do this again." (Id.)

Two months after his meeting with Dr. Johnson, Schell met with licensed social worker Judith Bello on December 10, 2007. (Id. at 389.) Consistently with previous ratings, Ms. Bello noted that Schell's GAF was 55-60. (Id. at 391.) Ms. Bello diagnosed Schell with major depression and alcohol abuse, in remission. (Id. at 390.) Schell reported experiencing insomnia, fatigue, low energy, poor concentration, and difficulty making decisions. (Id.) Schell continued to take Celexa for his depression. (Id. at 391.)

On March 13, 2009, Schell underwent a consultative examination with Dr. Debra Rosenblum, M.D. (Id. at 453.) Schell told Dr. Rosenblum that he had relapsed after two months

of sustained sobriety. Schell was friendly, interacted well, and maintained fair eye contact through the examination. (Id. at 454.) Dr. Rosenblum concluded that Schell "suffers from mood symptoms and panic attacks in the context of a history of alcohol abuse from which he is 3 weeks sober following a relapse." (Id. at 455.) Dr. Rosenblum diagnosed Schell with major depression, panic disorder, and alcohol abuse. (Id.) She gave him a GAF score of 55. (Id.)

On March 27, 2009, Schell again met with Dr. Johnson. (Id. at 552.) Schell reported that he was "doing okay" and that he had not been drinking. (Id.) He was diagnosed with alcohol dependence and bipolar disorder. (Id. at 554.) During this visit, Dr. Johnson assessed Schell's GAF at 55. (Id. at 555.)

Continuing through 2009, Schell was continually diagnosed with alcohol dependence and bipolar disorder and/or major depression. During this period, his GAF ranged from 50-55. (Id. at 510-12, 520-22, 524-25, 529-30.)

At Schell's request, both Dr. Johnson and Ms. Bello wrote letters to ALJ Mackay. (Id. at 441, 445.) In her July 10, 2009 letter, Dr. Johnson stated that she had treated Schell for 18 months and that he suffered from affective disorders, personality disorder, and substance abuse since at least as of his alleged onset date. (Id. at 441.) Dr. Johnson opined that Schell's symptoms would exist even if he remained sober and that the alcohol abuse was a coping mechanism and a byproduct of his other mental health conditions. (Id. at 442.) Dr. Johnson stated she did not believe alcohol was a contributing factor material to Schell's underlying disability. (Id. at 441-42.) In her July 14, 2009 letter, Ms. Bello stated that she had been treating Schell since December 20, 2007 and that he was unable to work due to his symptoms. (Id. at 444-45.)

B.  The ALJ's Decision

The ALJ first determined that Schell had not engaged in substantial gainful employment since July 16, 2006. (Id. at 10.) The ALJ determined that Schell's bipolar disorder and substance disorder were severe impairments and met listed disorders. (Id.) The ALJ did not find Schell's personality disorder to be a severe impairment. (Id.) The ALJ found that if Schell stopped abusing alcohol, he would continue to have a severe impairment or combination of impairments but that the impairment or combination of impairments would no longer meet or medically equal a listing. (Id. at 13.) The ALJ found that Schell would require minimal contact with the general public, co-workers and supervisors (id. at 15), and, therefore, he could not return to his past relevant work as a cashier and hairdresser due to the social interaction those jobs entail. (Id. at 17.) However, the ALJ did find that, assuming Schell stopped abusing alcohol and in light of the vocational experts' testimony along with his age, education, work experience, and residual functioning capacity, there were jobs existing in significant numbers in the national economy which Schell could perform. (Id. at 19.) Accordingly, because the ALJ found Schell would not be disabled if he stopped the substance abuse, he found that Schell's substance abuse was a contributing factor material to the determination of disability and that Schell was therefore not entitled to disability benefits. (Id.)

**III.  Standard of Review**

The ALJ is responsible for determining whether the claimant is disabled. 20 C.F.R. § 416.927(e); see Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). This Court must uphold the ALJ's decision if it is supported by substantial evidence in the record. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001). "If a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's]

conclusion," then substantial evidence to support the decision exists. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The ALJ also has the authority to "piece together the relevant medical facts from the finds and opinions of multiple physicians." Evangelista v. Sec'y of Health & Human Servs, 826 F.2d 136, 144 (1st Cir. 1987).

**IV.    Discussion**

The primary issue in this case is whether Schell's alcohol abuse affects his disability. An individual is not considered disabled under the Social Security Act if alcohol abuse or drug addiction is a contributing factor material to the determination of disability. 42 U.S.C. § 423(d)(2)(C).

Schell alleges that the ALJ erred in the following ways: (1) in failing to accord controlling weight to Dr. Johnson's medical opinion as expressed in her letter of July 10, 2009; (2) in failing to accord controlling weight to Ms. Bello's opinion as expressed in her letter of July 14, 2009; (3) in substituting his own lay opinion for the medical opinions of Dr. Johnson and Ms. Bello; and (4) in failing to apply the statutory factors that determine how much weight should have been given to Dr. Johnson's opinion. For these reasons, Schell says the ALJ's decision is not supported by substantial evidence in the record and therefore must be reversed.

In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence in the record and must be affirmed. More specifically, the Commissioner argues that: (1) the ALJ acted within his discretion in assigning little weight to the medical opinions of Dr. Johnson and Ms. Bello; (2) the ALJ did not substitute his own lay opinion for that of Dr. Johnson and Ms. Bello; and (3) the ALJ provided adequate rationale for discounting Dr. Johnson's opinion.

A.   The Opinion of Dr. Johnson

Schell argues that the ALJ improperly assigned little weight to the opinion of Dr. Johnson, who was one of Schell's treating physicians. The Commissioner, on the other hand, argues that Dr. Johnson's opinion was inconsistent with other substantial evidence of record and that therefore the ALJ was entitled to assign it little weight.

The issue of whether Schell is disabled is not an issue for any particular doctor but, rather, is reserved to the Commissioner. See C.F.R. § 404.1527(e)(1); 20 C.F.R. § 416.927(e)(1). It is true that the Commissioner generally will "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(d)(1). However, the Commissioner is not *required* to give "greater weight to the opinions of treating physicians" or accept their conclusions on the ultimate issue of disability. Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir. 1991). Furthermore, if a treating physician's opinion is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. See 20 C.F.R. §404.1527(d)(2); Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 2006).

Schell's argument centers on Dr. Johnson's letter, which stated that "Mr. Schell's symptoms would exist separate and apart from his alcohol issues and that his history of alcohol abuse is not a contributing factor that is material to his underlying condition." (R. at 442.) Schell argues that this opinion is "uncontroverted" and "supported by substantial evidence in the record." (Pl.'s Br. at 11-14.) Therefore, Schell argues that failing to accord it controlling weight is reversible error. However, in this case there is evidence in the record that is inconsistent with Dr. Johnson's conclusion and, thus, assigning Dr. Johnson's opinion little weight was both reasonable and within the ALJ's discretion.

Schell argues that Dr. Johnson was the only person who provided competent evidence on the issue whether Schell's alcohol abuse was a contributing factor material to his disability. Schell is correct that Dr. Johnson is the only person who explicitly stated an opinion to that effect. However, when the medical evidence is inconsistent, it is within the ALJ's discretion to "piece together the relevant medical facts from the opinions and findings of multiple physicians." Evangelista, 826 F.2d at 144. This is precisely what the ALJ did. The ALJ noted, and the record supports, that when Schell is sober, he can function and complete activities of daily living, is friendly and engaging, and has no more than moderate functional limitations. (R. at 14.) Schell himself testified that he attends Alcoholics Anonymous meetings (albeit without participating much), (id. at 42-43), and that he goes to appointments, goes to the library, and prepares meals, (id. at 333). The ALJ further noted that every time Schell suffered a period of decomposition, it occurred when he was drunk. (Id. at 14.)

Dr. Johnson's conclusion that Schell would remain completely disabled in the absence of substance abuse is also inconsistent with her own treatment notes, the treatment notes of Ms. Bello and Ms. Dolan, and additional record evidence. With regard to her own treatment notes, on March 29, 2009, Schell visited Dr. Johnson and reported that he had not been drinking. (Id. at 552.) Dr. Johnson assessed Schell's GAF at 55. (Id. at 555.) Such an assessment is not consistent with a conclusion that Schell was so markedly limited that he was completely disabled. See Whitzell v. Astrue, 726 F. Supp. 48, 49 (D. Mass 2010) (GAF of 55 indicative of moderate limitations in functioning.) Like Dr. Johnson, Ms. Bello, Ms. Dolan, and Dr. Rosenblum also assigned Schell GAF scores of 55-60, which provided additional evidence that was inconsistent

with Dr. Johnson's letter.[2] (Id. at 386, 391, 399, 455, 504.) See Gonzalez Rodriguez v. Barnhart 111 Fed. Appx. 23, 25 (1st Cir. 2004) (GAF scores "provide(s) a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning."). Of particular import is the fact that Ms. Bello assessed Schell's GAF at 55-60 during a session where she noted his alcohol use was at the time in remission. (R. at 389-90.) Such a finding is inconsistent with Dr. Johnson's finding that Schell would be completely disabled even without alcohol abuse.

Furthermore, treatment notes from Dr. Erebia and other clinicians and staff members at FCH note that Schell's major issue was his alcohol abuse and that many of his legal and social troubles stemmed from such abuse. (Id. at 294, 312, 411.) In addition, Dr. Broder noted that Schell had difficulty actually articulating what psychological problems he had. (Id. at 330). Schell also told Dr. Broder that he took public transportation "everywhere" and that his daily activities included cooking two meals a day and cleaning his apartment. (Id. at 333-34.)

Taken as a whole, the evidence in the record can be found to be at odds with a conclusion that Schell was unable to perform any type of work. Moreover, the ALJ did find Schell to be somewhat credible with regards to his symptoms and accordingly found that he was subject to non-exertional limitations in the work he could perform. (Id. at 18.) For this reason, the ALJ found that Schell was only capable of performing jobs where he had minimal social contact. (Id.

---

[2] Schell was twice diagnosed with GAF scores in the range of 34 to 45 in 2007. (R. at 370, 372, 374.) During both of these assessments, he was treated at HRI hospital after being admitted following alcohol binges and suicidal ideations. (Id.) Following his release, Schell recovered and was receiving GAF scores in the 55-60 range again. (Id. at 386, 390-91, 395-96, 554-55.) GAF scores in the range of 34 to 45 following alcohol induced hospitalizations do not contradict the ALJ's conclusion that absent alcohol abuse, Schell could appropriately function and hold a job. (Id. at 13-20.)

at 19.) The ALJ did not disregard the evidence that Schell struggled with social contact but, rather, incorporated such evidence into his findings.

Thus, while Dr. Johnson's letter and opinion does supply some foundation for the ALJ to conclude that Schell was disabled and that alcohol abuse was not a contributing factor material to the determination of disability, there is other substantial evidence in the record to support the ALJ's decision.

B.  The Opinion of Ms. Bello

Schell argues that the ALJ erred in failing to give controlling weight to the opinion of Ms. Bello, a licensed social worker. More specifically, Schell argues that Ms. Bello's opinion that Schell "suffers symptoms from his depression and personality disorder that severely restrict his ability to function in a normal social or business environment" (R. at 444) and that Schell's description of his symptoms was credible should have been accorded more weight by the ALJ .

The Social Security Administration makes a distinction between two types of sources: (1) acceptable medical sources and (2) other sources. See 20 C.F.R. § 404.1502; 20 C.F.R. § 416.902. "Other sources" are then further divided into two groups: medical sources and non-medical sources. Id. Licensed clinical social workers, such as Ms. Bello, are not considered acceptable medical sources but, rather, are considered other sources. See Alcantra v. Astrue, 257 Fed. Appx. 333, 334 (1st Cir. 2007); Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007). The Commissioner is not required to give controlling weight to non-acceptable medical sources. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 276 n.5 (1st Cir. 1988) (upholding ALJ's decision to reject a report from a counselor who was not an acceptable medical source). As is required, the ALJ considered Ms. Bello's findings but permissibly found them to be inconsistent with her own treatment notes and unsupported by objective record evidence. (R. at

13.) Accordingly, Schell is incorrect in arguing that the ALJ erred in giving little weight to Ms. Bello's opinion. The ALJ's decision to give Ms. Bello's report little weight was justified.

      C.      The ALJ's Purported Lay Opinion

Schell argues that instead of assigning controlling weight to Dr. Johnson's medical opinion, the ALJ substituted his own lay opinion. Schell specifically argues that in according little weight to Dr. Johnson and Ms. Bello, the ALJ was left to base his conclusion on: (1) impermissible inferences based upon records provided by non-treating physicians and physicians who did not treat Schell's psychological issues and (2) incorrect characterizations of Schell's testimony.

Schell is correct that the ALJ is not entitled to substitute his own impression of the claimant's health for an uncontroverted medical opinion. Carillo Marin v. Sec'y of Health & Human Servs., 758 F.2d 14, 16 (1st Cir. 1985). However, Schell is incorrect in arguing that this is what the ALJ has done. In explaining his decision to give little weight to Dr. Johnson's opinion, the ALJ refers to DSM-IV 193, which in sum states that a patient must be observed during a period of sobriety in order for a doctor to make a conclusion as to the role alcohol played in the patient's limitations. The ALJ, in part, decided to give little weight to Dr. Johnson's opinion because he found that she did not observe him during a period of sobriety. (R. at 12.) This decision by the ALJ is supported by evidence in the record and is not an instance of the ALJ substituting his lay opinion for that of a medical expert. (Id. at 407 (Ms. Dolan notes that it was difficult to know what Schell's diagnosis was because of how much he drank.).)

Schell also alleges that the ALJ relied on his own lay opinion to conclude that Schell's substance abuse remains ongoing. The argument is incorrect. Schell himself testified at the hearing that he drank a 40-ounce beer the week before the hearing, a clear indication that he was

still using alcohol. (Id. at 50.) This is not a substitution of medical opinion for a lay opinion but, rather, the ALJ using Schell's own words to make a finding that he continued to use alcohol.

D.      ALJ's Failure To Apply 20 C.F.R. §§ 404.1527(d)(2)-(d)(6) Factors

Schell next argues that in declining to give controlling weight to treating physician Dr. Johnson, the ALJ failed to apply the statutory factors set forth in 20 C.F.R. §§ 404.1527(d)(2)-(d)(6).[3]

Schell is correct that the ALJ did not individually go through each of the six factors listed. However, Schell is mistaken when he alleges that the ALJ's alleged failure to sufficiently discuss the 20 C.F.R. § 404.1527(d) factors constitutes a lack of good reasoning for his decision. The First Circuit has upheld the rejection of a treating physicians' opinion on the basis of discussion of only select factors. See Dietz v. Astrue, No. 08–30123, 2009 WL 1532348, at *7 (D. Mass. May 29, 2009) (citing Morales v. Comm'r of Soc. Sec., 2 Fed. Appx. 34, 36 (1st Cir. 2001).

Here, the ALJ explicitly considered both the supportability of Dr. Johnson's opinion and the consistency of Dr. Johnson's opinion with the record as a whole. (R. at 12-13.) Also of note is the fact that Dr. Johnson's letter, which is so heavily relied on by the plaintiff, does not contain any laboratory findings, diagnostic tests, or substantial reference to Schell's extensive medical record. See Lee v. Astrue, No. 10-10708, 2011 WL 2748463, at * 13 (D. Mass. July 14, 2011) (affirming ALJ's decision to assign limited weigh to treating physician's assessment when it was not supported by any relevant evidence.) As noted above, there is scant evidence in the record

---

[3] The six enumerated factors are: (i) the length of her treatment relationship and frequency of examination, (ii) the nature and extent of her treatment relationship, (iii) supportability, i.e., the adequacy of explanation for her opinions, (iv) consistency with the record as a whole, (v) whether she is offering an opinion on a medical issue related to her specialty, and (vi) other factors highlighted by Plaintiff or others. 20 C.F.R. §§ 404.1527(d)(2)-(6).

illustrating Dr. Johnson's personal treatment of Schell. Dr. Johnson's letter to the ALJ on July 10, 2009 is the first time that she, or anyone else who treated Schell, opined that he would be unable to work even absent alcohol abuse. (R. at 442.) While Dr. Johnson states this as her opinion, she does not point to any specific instances or reports in support of such a conclusion. Accordingly, the ALJ's failure to go individually through each of the § 404.1527(d)(2)-(d)(6) factors was not reversible error.

## V.     Conclusion

For the foregoing reasons, the plaintiff's Motion (dkt. no. 21) for Summary Judgment is DENIED and the defendant's Motion (dkt. no. 26) to Affirm the Decision of the Commissioner is GRANTED. The decision is AFFIRMED.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge